UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **In re:** | **Chapter 7** |
| **AMBER ERBSCHLOE,** | **Case No. 11-72562** |
| **Debtor.** | |
| **AMBER ERBSCHLOE** | |
| Plaintiff, | |
| v. | **Adversary Proceeding No. 12-07013** |
| **U.S. DEPARTMENT OF EDUCATION,** | |
| Defendant. | |

**MEMORANDUM OPINION**

At Roanoke in said District this 13th day of June, 2013:

On May 3, 2013, the Court held a hearing on Amber Erbschloe's (the "Debtor") complaint seeking discharge of her student loan debt under 11 U.S.C. § 523(a)(8). The parties agreed that in order for the Debtor's loans to be discharged under section 523(a)(8), the Debtor must establish by a preponderance of the evidence that the repayment of her student loans would be an undue hardship. The Debtor testified and presented several pieces of evidence, as well as the expert testimony of Dr. Miller, in support of her position that repayment of her student loans would be an undue hardship. The United States Department of Education (the "Defendant" or the "Government") presented no evidence to the Court and argued that the Debtor had failed to establish all three prongs of the *Brunner* Test. The Court took the matter under advisement and now makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

In 2007, the Debtor borrowed approximately $17,000 through the William D. Ford Direct Student Loan program while attending Virginia Polytechnic Institute and State University ("Virginia Tech"). Transcript of Oral Argument at 13, *Erbschloe v. Dep't of Educ.*, No. 12-07013 (Bankr. W.D.Va. May 3, 2013) ECF No. 47 [hereinafter Transcript]. Since graduating from Virginia Tech in 2009 with a bachelor's degree in studio art, the principal and accrued interest on the Debtor's student loans has grown to approximately $19,300. *Id.* While still in college, the Debtor made multiple payments on her student loans totaling approximately $372.27. *Id.* at 17 and 42-43. After graduation, however, the Debtor has been unable to make payments on her loans; yet the loans are not in default and have not accrued fees or penalties. When the Debtor realized she was unable to make her monthly payments on her loans, she contacted the loan servicer and explained her financial situation and that she needed some form of relief. *Id.* at 43. The servicer only provided her with information regarding a one-month forbearance option. *Id.* Once the Debtor received the paperwork for the forbearance, she completed it, submitted it, and was granted forbearance from her student loan payments for one month. *Id.* The Department of Education, although it had the opportunity to do so then, never provided the Debtor with any information regarding alternative repayment plans.[1] *Id.*

It is uncontested that the Debtor was the victim of a horrific attack and sexual assault in 2002 that left her with severe injuries, both mental and physical. It is further uncontested that shortly after the Debtor's ordeal, two of the Debtor's close friends were attacked, sexually

---

[1] In fact, the Government did not broach the subject of alternative repayment plans with the Debtor until the week of the trial after the Court held a pre-trial conference call with the parties. Even at trial, the Government was unable to state with any degree of certainty what the terms of such a repayment plan would look like. *See generally* Transcript of Oral Argument at 90-91, *Erbschloe*, No. 12-07013 (Bankr. W.D.Va. May 3, 2013) ECF No. 47 [hereinafter Transcript]. During the Debtor's testimony, she appeared as though she may have been willing to consider such an option had one been provided to her when she received her forbearance; however, when asked what she could afford to pay per month, the Debtor replied, "nothing." Transcript at 60.

2

assaulted, and murdered in separate and unrelated attacks. The similarity and result of those attacks has hindered the Debtor's ability to recover from and added to the stress of her own trauma. As a result of these attacks, the Debtor suffers from post-traumatic stress disorder. Transcript at 77.

In addition to the Debtor's mental trauma, the Debtor has been diagnosed with a "snapping scapula," which causes the Debtor pain and discomfort in her shoulder, neck, and upper back. Transcript at 27-29. Although the Debtor did not present any evidence directly linking the onset of her snapping scapula with the brutal attack in 2002, the Debtor's injury did not present with symptoms until after the Debtor received the student loan at issue in this case. The Debtor's injury prevents her from engaging in heavy lifting and strenuous activities. *Id.* at 29. The inability to lift heavy objects and engage in physically demanding activities precludes the Debtor from pursuing a career in the field of art installation because it prevents her from constructing the large scale, heavy sculptures for which the field is known.[2] *Id.* The snapping scapula also precludes her from other fields of employment that would put strain on her shoulder.

At the time of the trial, the Debtor had obtained employment working for a local auto shop as a service writer, which involves answering phones, making appointments, and ordering parts. Transcript at 61. The Debtor testified that her hours per week varied depending on whether or not she was needed, but that she generally worked between twenty five and forty hours per week. *Id*. At an hourly rate of $9.00, the Debtor makes between $225.00 and $360.00 per week or $900.00 and $1,400.00 per month before taxes; about $175.00 to $280.00 per week or $700.00 to $1,120.00 per month after taxes. *Id.* The Debtor claims to work thirty hours per week on

---

[2] Although the Debtor has a degree in Fine Arts, she has shown considerable promise in the field of art installation. Ms. Erbschloe's work has been featured in local newspapers, is on permanent display in the Taubman Museum of Modern Art, and received an award for best in show at the XYZ Gallery in Blacksburg, Virginia. Transcript at 30.

average, which would give the Debtor net monthly income of approximately $840.00. *Id*. at 61. The Debtor currently lives in Giles County with her boyfriend and has the following monthly expenses: rent of $230.00, utilities of $175.00, food of $200.00, clothing of $25.00, books and entertainment of $19.00, medical of $58.33, and auto insurance of $45.00.[3] Transcript at 38-41; and 66. Debtor's total monthly expenses, not including payments on her loan, are $752.33.[4]

## DISCUSSION

This Court has subject matter jurisdiction over this controversy under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) because the complaint requests that the Court determine the dischargeability of the Debtor's student loans under 11 U.S.C. § 523(a)(8). It is uncontested that the loan issued by the Government to the Debtor falls within section 523(a)(8). The only question before the Court is whether requiring the Debtor to repay her student loan by denying discharge of the debt would inflict an undue hardship on the Debtor.

### **Dischargeability under Section 523(a)(8)**

The Bankruptcy Code provides that government-issued student loan debt can be discharged only if a debtor can show that the failure to discharge the debt would impose an "undue hardship" on the debtor. 11 U.S.C. § 523(a)(8). The term "undue hardship," however, is not defined in the Code. Courts have found that in enacting section 523(a)(8) Congress attempted to create a heightened dischargeability standard through the use of the term "undue" that requires more than the general hardships found in most bankruptcy cases. *Education Credit Management*

---

[3]   At trial, the Debtor testified that she splits certain expenses equally with her boyfriend. For such expenses, the Court has only considered the Debtor's one-half share of said expenses for purposes of calculating the Debtor's total monthly expenses.

[4]   The Debtor mentioned additional expenses – prescription, gas, and transportation – but never provided monthly figures for said expenses. Transcript at 40-41, 50.

4

*Corp. v. Frushour*, 433 F.3d 393, 399 (4th Cir. 2005). The reasoning behind such a heightened standard was to protect the integrity of the student loan program, maintain its fiscal strength, and prevent debtors from easily passing student loan debts on to the taxpayers. *Id.* at 400.

### The *Brunner* Test

In the early years of section 523(a)(8), courts wrestled to pinpoint exactly what a debtor was required to show in order to prove that an undue hardship existed. From those early tests, the *Brunner* Test, adopted by the Second Circuit, has emerged as the majority approach for determining whether an undue hardship exists.[5] The Fourth Circuit has adopted the *Brunner* Test in the Chapter 7 context and it is the test this Court is bound to apply in this case. *Frushour*, 433 F.3d at 400. In *Brunner*, the Second Circuit found that the debtor needed to satisfy three factors in order to satisfy the "undue hardship" requirement:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir. 1987). The burden facing a debtor seeking an undue hardship discharge under section 523(a)(8) and *Brunner* is a difficult one. *Id.* at 399. The debtor must show "more than the usual hardship that accompanies bankruptcy." *Id*. In order to do this, courts have found that the debtor carries the burden of establishing all three of the *Brunner* prongs by a preponderance of the evidence. *Id*. at 400; *Frushour*, 433 F.3d at 400. If the debtor fails to establish any of the three *Brunner* prongs,

---

[5]   *See Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir. 1987); *Pennsylvania Higher Education Assistance Agency v. Faish*, 72 F.3d 298 (3rd Cir. 1996); *Frushour*, 433 F.3d 393 (4th Cir. 2005); *U.S. v. Gerhardt*, 348 F.3d 89 (5th Cir. 2003); *Oyler v. Educational Credit Management Corporation*, 397 F.3d 382 (6th Cir. 2005); *Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993); *United Student Aid Funds, Inc. v. Pena*, 155 F.3d 1108 (9th Cir. 1998); *Educational Credit Management Corp. v. Polleys*, 356 F.3d 1302 (10th Cir. 2004); and *Hemar Insurance Corporation of America v. Cox*, 338 F.3d 1238 (11th Cir. 2003).

then the debtor cannot succeed and the Court must deny the debtor's request to discharge his student loan debt.

Can the Debtor Maintain a Minimal Standard of Living if
Forced to Repay the Loan?

The Fourth Circuit has yet to analyze what a debtor is required to show to satisfy *Brunner*'s first prong in the Chapter 7 context. *See Spence v. Education Credit Management Corp.*, 541 F.3d 538 (4th Cir. 2008) (determined by *Brunner* factors two and three); *Educational Credit Management Corp. v. Mosko*, 515 F.3d 319 (4th Cir. 2008) (determined by the third *Brunner* factor); and *Frushour*, 433 F.3d 393 (determined by *Brunner* factors two and three). What has been said is that the *Brunner* Test requires a case-by-case approach to determine if expenses are or are not essential for maintaining a minimal standard of living. *Frushour*, 433 F.3d at 400. Other courts, however, have found that if "a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which a debtor may be discharged of his student loan obligations." *In re Correll*, 105 B.R. 302, 306 (Bankr. W.D.Pa. 1989).[6] The Court finds this interpretation consistent with the language of the first prong of the *Brunner* Test, which requires a court to review the debtor's current income and expenses and determine whether a minimal standard of living is possible if forced to repay the student loans. *See Brunner*, 831 F.2d at 396 ("(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans."). Furthermore, the Court finds that

---

[6]     *In re Correll* was cited approvingly by the Fourth Circuit in *Lokey v. Educ. Credit Mgmt Corp.*, 98 Fed.Appx. 938, 940-41, 2004 WL 1066315 (4th Cir. 2004), and *Floyd v. Educ. Credit Mgmt Corp.*, 54 Fed.Appx. 124, 125, 2002 WL 31839159 (4th Cir. 2002).

the *Correll* standard is consistent with the case-by-case approach adopted by the Fourth Circuit in *Frushour*.

With this standard in mind, the Court must look at the Debtor's current income and expenses and determine whether the Debtor's current budget, if reasonable and necessary, allows for a minimal standard of living. The Debtor averages approximately $840.00 per month in take-home pay. Transcript at 61. At trial, the Debtor testified to having several monthly expenses, but did not provide average monthly amounts for all of them. For those expenses for which the Debtor provided average amounts, the Debtor has at least $752.33 in monthly expenses. Transcript at 38-41; and 66. She failed to testify as to an amount for her monthly prescription, gas, and automobile maintenance expenses. *See generally* Transcript. The Debtor, however, did provide the Court with thirteen bank statements dating from July 2011 to August 2012. Over that thirteen month period, the Debtor's bank statements show that she spent approximately $1,165.51 on prescription drugs from Walgreens and RiteAid or approximately $89.65 per month. Plaintiff's Exhibit 11, *Erbschloe v. Dep't of Educ.*, No. 12-07013 (Mar. 7, 2012) ECF No. 37; Transcript at 40. Those same statements show that the Debtor spent approximately $1,697.32 on gas from various sources or approximately $130.56 per month. Plaintiff's Exhibit 11, *Erbschloe*, No. 12-07013 (Mar. 7, 2012) ECF No. 37; Transcript at 41. Furthermore, the statements show that the Debtor paid New River Nissan approximately $260.38 on vehicle maintenance or approximately $20.03 per month. Plaintiff's Exhibit 11, *Erbschloe*, No. 12-07013 (Mar. 7, 2012) ECF No. 37. When the Court considers the Debtor's additional, pro-rated expenses for prescriptions, gas, and automobile maintenance, the Debtor's monthly expenses total approximately $992.57. The Court finds that the Debtor's monthly budget is reasonable and necessary. The expenses to which the Debtor testified are not extravagant, nor were they out of

the ordinary. The Government questioned the Debtor's monthly Netflix charge of $9.00. Under the facts of this case, the Court finds that the Netflix charge is not unreasonable. The Debtor does not have cable or satellite television, both of which can be very expensive and significantly greater than the Netflix expense. Instead, the Debtor has chosen a less expensive, fairly modest approach to monthly entertainment. As the Debtor's monthly budgeted expenses are reasonable, yet still exceed her average monthly income, the Debtor's budget does not allow her to maintain a minimal standard of living. Therefore, the Court finds that the Debtor has established by a preponderance of the evidence the first prong of the *Brunner* Test.

Do Additional Circumstances Exist that Indicate the Debtor's State of Affairs
Are Likely to Persist for a Significant Portion of the Repayment Period?

The second prong of the *Brunner* Test is the heart of the test because it "most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy." *Frushour*, 433 F.3d at 401. As the *Frushour* Court explained it, "[t]he second factor is [ ] a demanding requirement and necessitates that a certainty of hopelessness exists that the debtor will not be able to repay the student loans. Only a debtor with rare circumstances will satisfy this factor." *Id.* (internal citations and quotations omitted). The Fourth Circuit has identified "illness, disability, a lack of useable job skills, or the existence of a large number of dependents" as rare circumstances that may satisfy *Brunner*'s second prong. *Id.* (quoting *Oyler v. Educ. Credit Mgmt. Corp.*, 397 F.3d 382, 386 (6th Cir. 2005)) (internal quotations omitted). In *Frushour*, the Fourth Circuit concluded that the debtor failed to establish *Brunner*'s second factor after considering: (1) the debtor's mental and physical health; (2) education; (3) professional licenses; (4) breadth of employment history; (5) previous employment income versus current income; and (6) the lack of effort to find and the inability to provide a reason for not finding higher paying employment. *Frushour*, 433 F.3d at 401-2; *see*

*also Spence*, 541 F.3d at 544 (finding that a low-paying job does not in itself create undue hardship, especially when the debtor likes the job and has not actively sought higher-paying employment after previously earning higher wages). Unlike the first and third prongs, *Brunner*'s second prong is prospective. It requires the Court to consider the Debtor's past and present and project whether her condition is such that repayment of her loan, at some future time prior to the conclusion of the loan's repayment period, appears to be certainly hopeless because of her current difficulty.

After considering the Debtor's current condition and all that surrounds it, the Court finds that the Debtor has not established that a certainty of hopelessness exists such that she will not be able to repay her student loan. What the Debtor has experienced and the continuing mental anguish associated with her past traumas is certainly horrific and something no person should ever have to experience. But as horrific and brutal as the Debtor's past has been or as bad as the current pain she experiences with her shoulder injury is, she was unable to show by a preponderance of the evidence how these factors suggest that her current *financial* difficulty is likely to persist for a significant portion of the repayment period.

It is true that the Debtor's snapping scapula condition prevents her from pursuing the profession for which she is trained or any other physically demanding career path; however, the snapping scapula and accompanying shoulder pain does not cause, nor render, insufficient income from which to pay the student loan. The Debtor did not show that employment in a job that does not require lifting her arm over her shoulder necessarily bars the Debtor from increasing her income. Furthermore, the Debtor failed to show how her snapping scapula condition foreclosed the possibility of taking other jobs or pursuing other careers for which she is qualified that would allow her to better her financial condition to the point where repayment of

her student loans is an option. In fact, by the Debtor's own testimony, she has already taken steps in that direction by transitioning from the food services industry to an entry-level administrative position. That job shows the Court three things. First, the Debtor is employable outside her chosen profession in a position that has some upward mobility. As the Court noted previously, the Debtor has a degree in studio art from Virginia Tech. Despite the focus of her degree, the Debtor has obtained entry-level employment in a different field, with a new set of job skills that may allow her to transition into a different position with a new employer for higher pay, better hours, and potentially benefits. Second, the Debtor is able to find work that does not strain her shoulder or cause her excessive pain. According to the Debtor, one of the reasons she took this new job was to minimize the amount of physical use of her shoulder. Transcript at 63. The Debtor's ability to find work that is not hindered by her shoulder injury is promising for the Debtor's future prospects. That she took it upon herself to find a new job that does not require her to strain her shoulder shows the Court that the Debtor is responsible, resourceful, and determined to change her financial condition despite her injury. Third, this new job provides the Debtor with increased income. If the Debtor averages thirty hours per week at $9.00 per hour, she would have an annual adjusted gross income ("AGI") of approximately $14,040. That would be an increase from her 2011 AGI of $8,663 and her 2010 AGI of $6,132. *See* Plaintiff's Exhibit 13-B, *Erbschloe v. Dep't of Educ.*, No. 12-07013 (Mar. 7, 2012) ECF No. 37; *and* Plaintiff's Exhibit 13-C, *Erbschloe v. Dep't of Educ.*, No. 12-07013 (Mar. 7, 2012) ECF No. 37. After graduating from college in 2009, the Debtor has had a slow, but steady increase in annual income despite her physical and mental hardships. At no time has the Debtor shown this Court that her injury or current administrative position precludes her from making a living in the future sufficient to repay her student loans.

In addition to the information concerning the Debtor's new job, the Debtor presented the expert testimony of Dr. Robert Miller, a clinical psychologist in Blacksburg, Virginia. Dr. Miller performed a diagnostic interview and psychological evaluation on the Debtor on August 1, 2012. In Dr. Miller's expert opinion, the Debtor currently suffers from chronic Post Traumatic Stress Disorder ("PTSD") stemming from the brutal assaults of the Debtor, as well as the assault and murder of her two friends. Transcript at 77. While such a condition potentially could be debilitating to one's ability to find work and function within a work environment, the Debtor has been able to hold steady employment since graduating from college. Furthermore, Dr. Miller testified:

> [The Debtor] is a remarkable young woman. She has resilience in ways and I mentioned in my report that the prognosis I think could be actually fairly good for her if some relief could come in her life for her to actually take some time to deal with what has happened to her. She is smart. She is not a person that is readily seeking disability. She wants to work.

Transcript at 79-80. The Court agrees with Dr. Miller's assessment of the Debtor and it is because of this assessment that the Court does not believe the Debtor's circumstances display the hopelessness required by the second prong of the *Brunner* Test. The Debtor, therefore, has failed to establish the second prong of the *Brunner* Test by a preponderance of the evidence. Without establishing all three prongs of the *Brunner* Test, the Debtor has not met her burden and is, therefore, not entitled to an undue hardship discharge under section 523(a)(8) at this time. *See Frushour*, 433 F.3d at 399; *Velarde v. Educ. Credit Mgmt.* (*In re Velarde*), 2009 WL 2614688, *4 (Bankr. E.D.Va. 2009); *Cosner v. Dept. of Educ. (In re Cosner),* 313 B.R. 690, 693 (Bankr. N.D.WV 2004). Because the Debtor has failed to establish the existence of the second prong of the *Brunner* Test, the Court does not reach the question of whether the Debtor made a good faith effort to repay her student loan. *See Frushour*, 433 F.3d at 400 (declining to decide whether the

debtor met the first prong because the debtor failed to carry her burden as to the other prongs of the *Brunner* Test).

## Undue Hardship and Partial Discharge of Indebtedness

Over the past twenty five years, the *Brunner* Test has grown to be almost synonymous with the phrase "undue hardship," as that phrase is used in the student loan context. As the test has grown in popularity over the years, however, the rational underlying the three prong approach has become less prudential in the wake of amendments to the Bankruptcy Code and the addition of new repayment programs offered by the Federal Government to student loan borrowers. When the test was first articulated by the Southern District of New York in 1985 and later adopted in whole by the Second Circuit in 1987, federal student loans were generally dischargeable under section 523(a)(8) after five years of repayment, but required a showing of "undue hardship" to discharge student loans prior to the five-year mark. *See* 11 U.S.C. § 523(a)(8) (West 1985). At that time, Congress had yet to create an income based repayment plan or any alternative repayment plans allowing borrowers to extend their repayment periods beyond the standard ten year repayment period. *See* Omnibus Budget Reconciliation Act of 1993, H.R. 2264, 103d Cong. (1993) (added income contingent repayment plan); Higher Education Amendments of 1998, H.R. 6, 105th Cong. (1998) (added Extended Repayment); *and* College Cost Reduction and Access Act, H.R. 2669, 110th Cong. (2007) (added income-based repayment). Given this landscape, the Southern District of New York created a three-prong test to determine when one might obtain a "discharge of student loans in bankruptcy prior to five years after they first come due." *In re Brunner*, 46 B.R. 752, 756 (S.D.N.Y. 1985). In doing so, they attempted to fold Congress's reasoning for allowing borrowers to discharge their student loan debt after five years into a workable definition of "undue hardship" that still maintained

Congress's intent that the repayment of student loans be a "very difficult burden to shake without actually paying them off" prior to five years. *Id*. at 755-56 (relying on Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93d Cong., 1st Sess. (1973)). What resulted from the Southern District of New York's efforts was a prospective test that projected the Debtor's state of affairs for a significant portion of the repayment period, which at that time would have been some period less than ten years. Given the dischargeability of student loans after five years, the relatively short repayment period for student loans, and the relative inflexibility of repayment terms and periods, the *Brunner* Test was designed as a means to gauge a debtor's ability to repay in the immediate, short-term future.

Today, however, courts must apply the *Brunner* Test within the context of income-based and extended repayment plans that allow borrowers to extend their repayment periods for twenty or more years, all the while making monthly payments as low as $0. As such, courts are taking a test that was designed to look at a debtor's short term ability to repay fixed amounts and applying it to determine whether a debtor's circumstances may change at some time in the next twenty or more years.[7] Furthermore, under some of these repayment plans, whatever remains due and owing at the end of the repayment period is forgiven by the Government. *See, e.g.*, 20 U.S.C. § 1098e(b)(7). With such options available to debtors, it is often difficult for courts to reconcile how making payments as small as $0 per month on a debt that may ultimately be forgiven can impose an undue hardship on a debtor. What is lost in this inquiry is that the Code does not ask whether minimal installment payments would be an undue hardship on the debtor, but rather whether the repayment of the debt would be an undue hardship on the debtor if forced to repay it. While the *Brunner* Test dictates that courts answer the question prospectively for immediate

---

[7]    This Court is no different. We are bound by the Fourth Circuit to apply the *Brunner* Test in all section 523(a)(8) cases. *See Frushour*, 433 F.3d 393.

13

discharge of a sum certain, partial and delayed discharge allows courts to answer the question definitively by setting parameters in certain cases that, if met, establish the existence of an undue hardship and trigger discharge of the unpaid portion of the student loan debt. It is this approach that we consider when determining whether we may grant Debtor's alternative request for a partial discharge of her student loan indebtedness. *See* Complaint at ¶ 26, *Erbschloe v. Dep't of Educ.*, No. 12-07013 (Bankr. W.D.Va. Mar. 7, 2012) ECF No. 1.

Partial Discharge of Student Loan Indebtedness

Although several Circuit Courts have addressed whether partial discharge is permissible under section 523(a)(8), the Fourth Circuit has yet to answer that question. Section 523(a)(8) does not distinguish between full discharge or partial discharge; rather, section 523(a)(8) refers generally to discharge. *See* 11 U.S.C. § 523(a)(8) ("A discharge under … this title does not *discharge* an individual debtor from any debt – unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor …."). The plain language of the Code, however, does not foreclose the possibility of a partial discharge. *See In re Mort*, 272 B.R. 181 (W.D.Va. 2002). Instead, section 523(a)(8) creates a rule that precludes discharge, unless excepting "such debt" from discharge would result in an undue hardship. Thus, it is the connection between "such debt" and "undue hardship" that controls the discharge; not whether the amount discharged represents the entire debt or such part of it as imposes the undue hardship. As such, the Court finds that section 523(a)(8) allows a Court to discharge some portion of the Debtor's student loans if the failure to do so would cause the Debtor an undue hardship. *Mort*, 272 B.R. at 185 (finding that section 523(a)(8) is not an all or nothing provision and that the discharge of any debt under section 523(a)(8) must be conditioned upon a finding of undue hardship).

Although the Fourth Circuit has not explicitly held that partial discharges are permissible under section 523(a)(8),[8] the District Court for the Western District of Virginia has definitely held such. In *In re Mort*, Judge Jones held that a partial discharge of student loan debt was permissible under section 523(a)(8) provided that such discharge was conditioned on a finding of undue hardship and not the bankruptcy court's equitable powers under section 105. *Mort*, 272 B.R. at 185. The court in *Mort* found that the "better approach is to permit a partial discharge only to the extent that it would be an undue hardship for that part of the loan obligation not to be discharged." *Id.* In its ruling, however, the court did not elaborate on a test for undue hardship in the partial discharge context. What Judge Jones did hold was that the failure to show a good faith effort to repay one's student loan obligations will preclude a hardship discharge of any portion of the student loan debt. *Id.*

Pursuant to the holding in *Mort*, we must consider whether the Debtor has made a good faith effort to repay her student loans. After review of the record, the Court finds that the Debtor has made a good faith effort to repay her loans. The Debtor made several payments on her student loan when not required to do so. Transcript at 42-43. Furthermore, the Debtor has made efforts to maximize her income, at times working three jobs, and reduce her expenses by splitting them with her boyfriend. *Id.* at 42, 38-40. Finally, when the Debtor was facing financial difficulties, she contacted the Government to seek assistance with her repayment terms. *Id.* at 43. At that time, the Government only offered the Debtor a one-month forbearance, which the

---

[8] The Fourth Circuit has released the unpublished opinion of *Floyd v. Educational Credit Management Corp.*, 54 Fed.Appx. 124 (4th 2002) in which the court held that the bankruptcy court's findings that a debtor was entitled to a partial discharge of his student loan debt were not clearly erroneous. In *Floyd*, the bankruptcy court made particular findings that led it to conclude that a sum certain was an undue hardship for the debtor to repay. *Floyd*, 54 Fed.Appx. at 125. In doing so, the bankruptcy court adhered to the *Brunner* Test although the Fourth Circuit had yet to adopt it. *Id*. In reversing the District Court, the Fourth Circuit did not approve or endorse the approach taken by the bankruptcy court. Instead, the Fourth Circuit merely held that the bankruptcy court had not committed clear error. *Floyd* did not address a partial discharge of a potential uncertain sum.

Debtor pursued and obtained. At no time did the Government offer the Debtor any information on alternative repayment plans and could not even say at trial with any certainty what such a plan might look like. *Id.* These facts lead the Court to believe that the Debtor has made a good faith effort to repay her student loans and is not merely trying to avoid repaying her obligations to the Government by filing bankruptcy.

In the first part of this opinion, the Court found that the Debtor failed to establish by a preponderance of the evidence that the Debtor's current financial hardship is likely to persist for a significant portion of her repayment period. Implicit in this prospective conclusion is that although the Debtor is currently below 150 percent of the poverty line, the Court does not believe her current inability to maintain a minimum standard of living will persist or impede her from making a greater living in the future and, ultimately, pay back her student loans. In the meantime, the Government has suggested that the Debtor may qualify for the Income-Based Repayment Plan ("IBRP"), which allows certain borrowers to extend the repayment period for their student loans to twenty-five years and potentially pay less per month than they would under the standard repayment plan option. 20 U.S.C. § 1098e. As the Debtor is currently unmarried and has annual income below 150 percent of the poverty line, the Court finds that the Debtor has a "partial financial hardship," qualifies for the IBRP, and would have monthly payments of $0 for as long as her current financial situation persists. *Id.* at § 1098e(a)(3) and (b)(1). In the event that the Court is correct about the Debtor's ability to improve her financial condition in the years to come and, thus, eliminate her partial financial hardship, the Debtor can elect to stay in the IBRP for the duration of the repayment period and her monthly payments will not exceed the amount she is currently required to pay under the standard repayment period. *Id.* at § 1098e(b)(6). At the

end of the twenty five year repayment period, any amount due and owing on the student loan is forgiven by the Department of Education.[9] *Id.* at § 1098e(b)(7).

To the extent that the Debtor qualifies for and does participate in the IBRP, the Court finds that any balance due and owing at the end of the twenty five-year repayment period represents the portion of the Debtor's student loan that would impose an undue hardship on the Debtor and is hereby discharged prior to its forgiveness under section 1098e(b)(7).[10] *In re Grove*, 323 B.R. 216 (Bankr. N.D. Ohio 2005). If the Debtor's hardship continues for the next twenty five years to the extent that she is unable to repay her student loans, then the hardship is greater than those hardships facing the average debtor. *Frushour*, 433 F.3d at 399. By conditioning discharge of the Debtor's student loans remaining after twenty five years on her pursuing the IBRP and fulfilling her obligations under that plan, the Court ultimately removes, in the partial discharge context, the prospective nature of the *Brunner* Test's undue hardship determination. In doing so, the Court recognizes that the Debtor cannot currently maintain a minimal standard of living if forced to repay the student loan, the Debtor's income is currently below 150 percent of the poverty line, the Debtor has made a good faith effort to repay her loans, and will have to continue to make a good faith effort to repay those loans over the next twenty five years in order

---

[9] The amount forgiven at the end of the repayment period, however, would constitute imputed income and saddle the Debtor with a new debt, due and owing to the Government immediately. 34 C.F.R. § 685.209(c)(4)(iv); 26 U.S.C. § 61(a)(12). This fact may be considered in determining whether to grant partial, but delayed discharge of a debtor's student loan debt. *Grove*, 323 B.R. at 229-31. In doing so, the court recognizes the potential that a debtor may pay more in discharge of indebtedness income after twenty five years of making $0 monthly payments than he would if he simply paid the principal on his student loan in one lump sum. *Id.* As such, the "forgiveness" of a debtor's student loan at the end of the IBRP becomes new debt that is due immediately and, accordingly, is not a true discharge or fresh start.

[10] In making this finding, the Court applies the *Brunner* Test. The Court has previously concluded that the debtor has met the first prong of the *Brunner* Test. The second prong of the *Brunner* Test, the requirement to project, becomes inapplicable because at the end of the twenty five year repayment term, the Debtor was either able to repay the entirety of her obligation or the remaining portion was an undue hardship; there is no need at the end of twenty five years for the Court to project whether facts exist showing that the Debtor's hardship is likely to persist for a significant portion of the repayment period because the repayment period has been exhausted. Finally, the Court has concluded that the Debtor has sufficiently shown a good faith effort to repay the loans and, thus, has met the third part of the *Brunner* Test.

17

to ultimately receive a discharge of her student loans. By taking a wait and see approach, the Court is not required to make an arbitrary estimate of what may be an appropriate amount to partially discharge, the Government is provided with the maximum amount of time to collect on its loan, and the Debtor is effectively granted a fresh start by avoiding the imputation of income from the Government's forgiveness of the Debtor's student loan debt. The Court finds that this approach in a partial discharge inquiry is consistent with the three-prong approach taken by the court in *Brunner* and Congress's intention that student loans be "a very difficult burden to shake without actually paying them off." *In re Brunner*, 46 B.R. at 756.

## CONCLUSION

The Debtor has failed to provide the Court with sufficient information to find by a preponderance of the evidence that circumstances exist suggesting that the Debtor's current financial hardship is likely to persist for a significant portion of the repayment period of the student loan. As such, the Debtor has failed to establish the second prong of the *Brunner* Test and is not entitled to an immediate discharge of her student loans. The Debtor, however, has established current and significant financial hardship, as well as her good faith effort to repay her student loan. Furthermore, the Court has found that the Debtor qualifies for the Income Based Repayment Plan. Given these circumstances, if the Debtor enrolls in the IBRP, fulfills her obligations under that Plan, and still has an amount due and owing at the end of the repayment period, the Court finds that the amount due and owing at the end of the repayment period is an undue hardship under section 523(a)(8) and is hereby discharged prior to any forgiveness granted by the Government pursuant to 20 U.S.C. § 1098e(b)(7). The Court will enter a separate, contemporaneous order consistent with this opinion.

Copies of this memorandum opinion are directed to be sent to the Debtor, Amber Erbschloe, 141 Rogers Road, Ripplemead, VA 24150-3026; Debtor's counsel, Steven Dennison Smith, S.D. Smith Esquire, PLLC, 125 N. Main Street, #500-353, Blacksburg, VA 24060; the Defendant, United States Department of Education, c/o Chad Keller, Litigation Support, 50 Beale Street, Suite 8629, San Francisco, CA 94105; Defendant's counsel, Sara Bugbee Winn, U.S. Attorney's Office, PO Box 1709, Roanoke, VA 24008-1709; and the Chapter 7 Trustee, George I Vogel, PO Box 18188, Roanoke, VA 24014.

**Entered: June 13, 2013**

_____

Rebecca B. Connelly

U.S. Bankruptcy Judge

19